Plaintiff-appellant LMS Marketing, Inc. (hereinafter "LMS") appeals the January 10, 2000 Judgment Entry of the Stark County Court of Common Pleas which adopted a magistrate's decision dismissing LMS' complaint for breach of contract and unjust enrichment. Defendant-appellee is Grove Corporation, dba Knox Video (hereinafter "Knox").
 STATEMENT OF THE CASE AND FACTS
LMS and Knox enjoyed a long term business relationship. LMS is a manufacturer's representative firm. Knox is in the business of designing and selling specialized video equipment. LMS and Knox entered into a written agreement for representative services on May 1, 1983. Pursuant to this agreement, LMS sold and promoted the sale of Knox products. In return, Knox paid LMS a commission on all Knox products sold within a designated territory. Through mutual agreement of the parties, this agreement was terminated in the late 1980s. On November 19, 1991, Knox entered into a new representative agreement with LMS. Like the old agreement, LMS would sell and promote the sale of Knox's product in return for a commission on all products sold within its designated territory. Pursuant to the agreement, Knox was to pay LMS a 10% commission on Knox products and an 8% commissions for any "IMAGR" series products. On or about December 7, 1992, during the term of the representative agreement, Mick Mandabach, the sole shareholder and employee of LMS, contacted Phil Edwards, the President of Knox. Mr. Mandabach explained he had had discussions with George Carrick, the product manager of electronic security at Diebold, Inc., regarding Diebold's need for a teller matrix system. A teller matrix system would permit video signals between bank customers and bank tellers for drive-in window systems. Mr. Mandabach told Mr. Carrick Knox might be able to design and produce such a system. Mr. Edwards sketched drawings of the proposed application for Diebold. Shortly thereafter, Mr. Edwards provided Mr. Mandabach with a preliminary quote for the video message and routing system. On December 19, 1992, Mr. Mandabach presented Knox's preliminary quote to Diebold representatives, however, Diebold did not place any orders with Knox at the time. Instead, Knox and Diebold continued their intermittent conversations about potential products without LMS' assistance until July, 1993. On May 5, 1993, LMS and Knox mutually agreed to terminate their representative agreement. Knox agreed to continue paying LMS' commissions under the representative agreement for orders received from LMS' territory through July 15, 1993. It is at this point the parties dispute the facts leading to this lawsuit. At trial, Mr. Mandabach testified he reached an oral agreement with Knox in May of 1993. Pursuant to this oral agreement, LMS was to receive an 8% commission on all business Knox did with Diebold pertaining to the teller matrix system as compensation for LMS' efforts for bringing the parties together. LMS maintains the terms of the agreement with regard to the teller matrix system was a separate oral contract from the representative agreement terminated on May 5, 1993. On July 8, 1993, Diebold responded to Knox's December 1992 quote. From August, 1993, through October, 1993, Knox and Diebold exchanged specifications for a modified Knox product for Diebold. On October 25, 1993, Diebold ordered a prototype which Knox shipped to Diebold in December of 1993. In March, 1994, Knox sent a quote to Diebold specifying minimum quantities and prices desired if Diebold would order switchers from Knox. On April 29, 1994, Knox received nine scheduled orders from Diebold. On May 2, 1994, Knox received an order from Diebold for a second prototype. In May of 1994, one year after the alleged formation of the oral contract, Mr. Mandabach contacted Knox and requested something in writing evidencing the oral agreement. Mr. Mandabach testified he received a letter from Roland Blood, the general manager of Knox, dated May 19, 1994, confirming the oral agreement. Mr. Blood and Mr. Edwards also testified at trial. Each presented testimony directly contradicting Mr. Mandabach and specifically denying the existence of any oral representative agreement. Mr. Blood testified Mr. Mandabach called him on May 19, 1994. At that time, the representative agreement with LMS had been terminated for over one year. Mr. Mandabach asked Mr. Blood if he was going to receive any money on sales made by Knox to Diebold. Because Mr. Blood was not authorized to make that decision, he had a conversation with Mr. Edwards. Mr. Edwards testified he made a decision to reward Mr. Mandabach with an 8% commission for the nine Diebold orders Knox had received on April 29, 1994. Mr. Blood confirmed this 8% commission on the nine orders in the letter dated May 19, 1994. The May 19, 1994 letter states, in pertinent part: Dear [Mr. Mandabach],
Knox Video acknowledges your help, with much appreciation, in securing orders from Diebold for units to be shipped to them according to their schedule.
We agree to pay you 8% commissions on these sales and you will receive a blue copy of the invoice when shipments are made.
Again, thanks for your help.
Sincerely, [Roland Blood] Vice President
In July, 1994, Knox shipped its first production units to Diebold from the April, 1994 order. On October 23, 1994, Knox paid LMS the amount of $1,074.32. On November 23, 1994, Knox paid to LMS the amount of $1,312.72. On December 23, 1994, Knox paid LMS $1,074.32. Knox contends its payment of these commissions fulfilled the reward Knox promised to LMS. These check represented Knox's last payment to LMS. On February 26, 1999, LMS filed a complaint against Knox alleging breach of contract and unjust enrichment. The matter proceeded to a bench trial before a magistrate on December 3, 1999. At the conclusion of the trial, the magistrate ordered the parties to submit proposed findings of fact and conclusions of law. On January 10, 2000, the magistrate issued her decision finding in favor of Knox and against LMS on both of LMS's claims. The magistrate's decision was signed by the trial court. On February 4, 2000, LMS filed objections to the magistrate's decision. In a February 28, 2000 Judgment Entry, the trial court overruled appellant's objections. It is from these judgment entries appellant prosecutes its appeal, assigning the following as error:
 I. THE TRIAL COURT ERRED IN CONCLUDING THAT THE CONTRACT TO PAY AN 8% COMMISSION ON GROVE'S SALES TO DIEBOLD DID NOT EXIST.
 II. THE TRIAL COURT FAILED TO CONSTRUE ANY AMBIGUITIES IN THE CONTRACT AGAINST DEFENDANT-APPELLEE AS THE DRAFTER.
 III. THE TRIAL COURT ERRED BY FAILING TO LOOK ONLY TO THE FOUR CORNERS OF THE CONTRACT.
 IV. THE TRIAL COURT ERRED BY CONCLUDING THAT PAYMENTS MADE TO PLAINTIFF-APPELLANT WERE GRATUITOUS.
 V. THE TRIAL COURT IMPROPERLY DISMISSED PLAINTIFF-APPELLANT'S UNJUST ENRICHMENT CLAIM.
 I, II, III, IV
Because appellant's first four assignments of error each depend on the propriety of the trial court's conclusion no oral contract existed, we address said assignments together. We are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978), 54 Ohio St.2d 279. "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty." Ford v. Tandy Transp. Inc. (1993), 86 Ohio App.3d 364, 380, 620 N.E.2d 996 (citing Restatement of the Law 2d, Contracts (1981) 5, Section 1). In order for a party to be bound to a contract, the party must consent to its terms, the contract must be certain and definite and there must be a meeting of the minds of both parties. Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134. Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. Ford, 86 Ohio App.3d at 380,620 N.E.2d 996. Normally, mutual assent is effected by offer and acceptance. Id. Without consideration there can be no contract. Brads v. First Baptist Church of Germantown, Oh. (1993), 89 Ohio App.3d 328, 336. Consideration consists of either a benefit to the promissor or a detriment to the promissee. Cooper v. Nason (Jun. 22, 1993), Lorain App. No. 92CA005474, unreported. To constitute consideration, the benefit or detriment must be "bargained for." Kaufmann's v. Fiduciary Mgt., Inc. (Sept. 8, 1993), Hamilton App. No. C-920399, unreported. Past consideration is not legally sufficient to support a contract. Gem Sav. Assn. v. Aqua Sportsman, Inc. (Aug. 12, 1992), Hamilton App. No. C-910361, unreported. In appellant's first assignment of error, it maintains the trial court erred in concluding there was no contract in existence between LMS and Knox to pay an 8% commission on Knox's sales to Diebold. We disagree. At trial, Mr. Mandabach testified about the formation of the oral agreement:
 Q. Was there any other arrangements made between LMS and Knox Video on or about [the time of the termination of the representative's agreement]?
 A. Well, we had started discussions concerning Diebold, and I had brought the parties together, and it was already agreed that it was a separate issue, not, — had nothing to do with this contract, and that I would be paid 8 percent commission on the business with Diebold. It was an oral agreement.
* * *
 Q. When the * * * sales rep agreement was terminated in 1993, did you have some discussions with Knox regarding Diebold? Yes. Going forward with Diebold? * * *
 A. Well, since our contract was being canceled, obviously I had a concern about the business that we were in the midst of trying to develop with Diebold. And Knox at that time assured me * * * they would pay me 8 percent commission on the business that we did with Diebold.
* * *
Q. Who did you speak with at Knox?
A. Roland Blood.
* * *
 Q. And what else did Mr. Blood say to you during those conversations or conversation?
 A. Well, that he was sorry that we were parting company, but he assured me that the business that we were working on, because nothing really had happened at that time with Diebold, that I would be paid 8 percent commission on the continuing business with Diebold.
* * *
Q. And was that for the life of the product?
A. As far as I was concerned it was.
* * *
 A. In or around [May, 1994] I did not have a written agreement with Knox Video. I picked up the phone and called Roland. I said, Roland, you know we're starting to do some business. I would feel much more comfortable if you would give me something in writing that states what our deal is. And he says, Mick, no problem. I'll be happy to do that.
Shortly after that I received a letter from Roland Blood.
T. at 41, 55-58, 59-60.
The testimony of Mr. Edwards and Mr. Blood, in contrast to the above quoted testimony, indicated the parties did not enter into a contract. Mr. Edwards testified:
 A. My understanding from [Mr. Blood] was that [Mr. Mandabach] was calling to ask or to say that there was some orders out of Diebold, and was he going to get anything out of it.
Q. Who had to make that decision?
A. That would be my decision.
* * *
 Q. Did you have any belief that you had any obligation to pay Mr. Mandebach on orders from Diebold on May 19, 1994?
A. No, sir. we had not obligated ourselves.
Q. And so what decision did you make that day?
 A. I made the decision to * * * reward * * * 8 percent of the aggregate of these orders, so that it was a way to reward and encourage this kind of participation in the future.
 Q. Is this the first time that you've ever done something like that?
 A. I'm quite certain it's not the first time that we paid a commission that we weren't legally obligated.
 Q. And what, you're not obligated to pay them. Why do you pay them?
 A. We pay them if there is some substantial involvement by a rep, if a rep for some reason out of his control couldn't corral those orders before his, the grace period on his termination expired.
 On occasion we would actually compensate somebody without any agreement whatsoever simply because it was clear that he gave us some help with a given sale.
Q. So if you're not obligated to pay them, why do you do that?
 A. We felt that it encouraged a good relationship. We already had two relationships with [Mr. Mandabach] before. We can't — to continue that, we felt it was a good move on our part.
* * *
Q. What orders did you intend to pay him something for?
A. The orders we had received.
* * *
 Q. Now, did you ever promise to give Mr. Mandabach commissions on every routing switcher you ever sold to Diebold?
A. No, sir.
 Q. You ever had an agreement with any representative that gave them the right to receive commissions on a product for as long as you sold the product to that customer?
A. No.
* * *
 Q. Did you ever intend to enter into any sort of agreement with Mr. Mandabach to pay him forever on the sale of routing switches to Diebold?
A. Absolutely not.
 Q. Did you ever pay Mr. Mandabach on any orders after the initial ones that we have discussed?
A. No.
* * *
 Q. Did anybody ever report to you that they had entered into that, a separate new agreement with Mr. Mandabach from that date?
A. No, certainly not.
 Q. Anybody ever tell you to enter into some oral agreement to pay him more money on that day if something happened in the future?
A. No, they couldn't. T. at 167-169, 170, 172-173, 175.
Finally, Mr. Blood testified:
 Q. * * * Now, let's go to May of 1993. Do you recall when Mr. Mandabach's manufacturer's representative agreement was terminated?
A. Yes, I do. It was terminated in May of 1993.
* * *
 A. Well, I ended up as a result of that conversation sending him a letter acknowledging the termination of his agreement.
* * *
 Q. Now, did you talk about anything else besides the termination of the rep agreement?
A. No.
 Q. You and Mr. Mandabach have any discussions about a separate deal regarding Diebold?
A. No.
 Q. Did he ever ask you if there was a — to make an agreement with him regarding orders from Diebold if they ever occurred?
A. No.
 Q. Now, are you sure that didn't happen? He has testified that occurred back at that time. Did that occur?
A. It did not.
 Q. Did you have any discussion with Mr. Mandabach regarding a separate deal regarding Diebold?
A. No.
Q. At any time?
A. No.
 Q. Sometime after those orders came in on April 29, 1994, you did have a communication with Mr. Mandabach, didn't you?
A. That's correct.
Q. Do you recall when that occurred?
A. It was on or about May 19, 1994.
* * *
Q. He called you?
A. Yes, he did. * * *
 He wanted to discuss — as I recall, the question was something on the order of what are you going to pay me for these orders? And I didn't know. I didn't have an answer for him at that time on — the phone.
 * * * he asked for a note. He actually use the word "note" to tell him what we were going to pay him for these orders, and I didn't have a figure of anything to give him at that time.
Q. What did you do?
 A. Well, we stopped talking and I discussed the situation with Phil Edwards.
Q. And what were the results of that discussion?
 A. The results were that Phil agreed that 8 percent commission was to have been paid for the orders that we had gotten in.
* * *
T. at 229-231, 237-238.
In its conclusions of law, the trial court found no contractual relationship existed at the time Diebold placed its orders in 1994. January 10, 2000 Magistrate's Decision at 4. We find the trial court's conclusion was supported by competent credible evidence. Both Mr. Edwards and Mr. Blood testified extensively they did not enter into an agreement with LMS to pay any commission on products manufactured and delivered after the termination of LMS's second representative's agreement. The trier of fact was free to accept or reject any or all of the testimony presented. The trial court apparently chose to accept the testimony of Mr. Edwards and Mr. Blood. Accordingly, LMS's first, second, third, fourth, and fifth assignment of error are overruled.
 V
In appellant's fifth assignment of error he maintains the trial court erred in dismissing his cause of action for unjust enrichment. We disagree. As stated above, the applicable standard of review is manifest weight of the evidence. In order to recover under a theory of unjust enrichment or quasi-contract, a plaintiff must prove by a preponderance of the evidence: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) for him to retain that benefit under circumstances where it would be unjust for him to retain that benefit without payment. Hambleton v. R.C. Barry Corp. (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298. See, also, Hummel v. Hummel (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923.
In the instant matter, LMS maintains it conferred a clear benefit to Knox by introducing Knox to Diebold. LMS contends but for its efforts, no sales would ever have occurred between Diebold and Knox. Therefore, LMS argues it conferred a benefit on Knox; Knox knew of the benefit; and Knox retained the benefit unjustly and without payment to LMS. As noted by appellee, LMS brought the parties together while under its written representative agreement with Knox. At that time, the representative agreement covered such introductions. Thereafter, appellant was paid all amounts owed to him by Knox after the cancellation of the representative agreement. As discussed supra, the trial court had competent, credible evidence that no other agreement was made between LMS and Knox. Accordingly, LMS' claim for unjust enrichment depends upon whether or not Knox ever compensated LMS for the benefit conferred, i.e., the introduction of Diebold as a source of business. LMS presented no evidence it developed or facilitated development of the products ultimately resulting in a profit to Knox. The only benefit conferred was the initial introduction, and perhaps the presentation of the proposed specifications and quotes. However, LMS admitted it was compensated for nine orders. We cannot say, in the absence of some agreement between the parties, LMS was not adequately compensated for its services in introducing the parties.
Accordingly, we find the trial court's decision to dismiss LMS's unjust enrichment claim was supported by competent, credible evidence. The January 10, 2000 and the February 28, 2000 Judgment Entries of the Stark County Court of Common Pleas are affirmed.
Hoffman, J. Gwin, P.J. and Wise, J. concur